*The inhabitants of* LEWISTON *vs. The inhabitants of* N. YARMOUTH.

The Resolve of *March* 19, 1821, rendering valid a certain class of marriages, so far as it has a bearing upon questions of settlement under the pauper-laws, for expenses incurred subsequent to its passage, is constitutional.

The wives and children of men who had been married *de facto* by the persons described in the Resolve of *March* 19, 1821, follow the settlement of the husband.

THIS action, which came before the Court upon a case stated by the parties, was *assumpsit* for the support of two paupers ; in which the principal question was whether the Resolve of *March* 19, 1821, legalizing certain marriages, was constitutional, so far as it affected the settlements of the parties and their issue.

It was agreed that *Peter Hammond*, the grandfather of the paupers, had his legal settlement in *North Yarmouth* prior to the year 1767 ; and that the settlement of *Patience Hammond*, their mother, was originally derived from him.    She was married in 1802, if the marriage was legal, to *Joseph Wright*, then dwelling and having his legal settlement in *Lewiston*.    The marriage was solemnized by *Benjamin Cole*, an elder of the Baptist communion ; who was ordained *August* 30, 1798, at *Lisbon*, in the county of *Lincoln*, where he then resided,

Lewiston *v.* North Yarmouth.

as an itinerant minister, without parochial charge, but " to travel or settle in any part of God's vineyard, abroad or at home, as duty shall call;" which was the usual form of ordination in that communion. In the autumn following, elder *Cole* removed to *Greene,* where he dwelt two or three years; thence he went to *Lewiston,* where he performed divine service for a society of his denomination, the principal part of the time for eighteen months; after which he preached there about half the time, and at various other places in the State during the other half; but he never was under any parochial engagement for any specified term of time.

The parents of the paupers cohabited together as man and wife, until her death, which was in 1818; in a year or two after which, the father finally abandoned his family of children. They were furnished with supplies as paupers, by *Lewiston,* within a year prior to the passage of the *Stat.* 1821, *ch.* 122, and also subsequent to the passage of the Resolve before mentioned.

*Allen,* for the plaintiffs, upon these facts, contended that the marriage having been solemnized by one not legally qualified, was merely void. No settlement was affected by it. Any construction of the Resolve, therefore, which should extend its operation to render the marriage valid to all intents, would be retrospective and void. The day before it was passed, the children were illegitimate, having the settlement of their mother, in *North Yarmouth.* Had she then died, her estate must have gone immediately to her heirs at law, without the intervention of a tenancy by the curtesy; and her children would not be liable on her covenants. Yet the day after, upon the construction contended for by the defendants, the husband would be tenant by the curtesy, and the children become burthened with new liabilities. And if one had entered into contract with *Lewiston* to support all their poor for a year, he would, by the operation of the same principle, be liable to support an indefinite number, whose settlement was not in that town when the contract was made.

But if the Resolve can have this operation, it is only in those cases where both the parties were living when it was passed, and continued afterwards to dwell together as man and wife. But here, one party was then dead, and so could not assent. If the doctrine of the de-

fendants prevails, a mariage contract will be created between two persons, with the assent of only one of them ; and a principle be thus sanctioned which will be dangerous, in the extreme.

*Orr*, for the defendants. The resolve can have no such effect as is apprehended. The legislature has a right to prescribe touching all future cases of settlement ; and wherever an act has a prospective view, it is so far constitutional. In *Brunswick v. Litchfield* 2. *Greenl.* 28, the plaintiffs went for monies expended prior to the Resolve ; which could not operate on rights vested, and liabilities already fixed. But as to future liabilities, the legislature has a right to distribute them at its pleasure.

The Resolve makes no provision for the assent of parties. It declares all marriages of a certain description to be legal. Children of marriages reputed legal are never illegitimate while the parent lives ; nor are they heirs, during the life of the father. The only exception made by the legislature, is of persons who have separated, and one of the parties has married again. It means a voluntary separation, and not one by death ; and it excludes only the case of a subsequent marriage.

PREBLE J. delivered the opinion of the Court.

It appears from the facts in the case that the mother of the paupers, prior to the passage of the Resolve of *March* 19, 1821, had her legal settlement in *North Yarmouth ;* that the mother was married in 1802, supposed by the parties legally, but the person who performed the marriage ceremony was not legally authorized to solemnize marriages ; that the mother continued ever after to live with her husband, until his decease, and that the paupers whose settlement is contested were the fruit of their union. It further appears that the father of the paupers, the husband *de facto,* had his settlement in *Lewiston.* The question therefore presented in this case, for the decision of the Court, is whether the Resolve already mentioned is constitutional and valid, so far as to render the marriage a valid marriage, for all the purposes of the settlement act.

Every statute and resolve passed by the legislature is presumed to be constitutional. To justify a court in declaring an act to be

unconstitutional, its provisions must be clearly and manifestly repugnant to the provisions of the constitution. The legislature has no power to disturb vested rights; but rules for the settlement of paupers have always been regarded by the courts as matters of mere positive or arbitrary regulation, in establishing which the legislature is limited in its power only by its own perception of what is proper and expedient. Thus by the act of *March* 21, 1821, *ch.* 122. the settlement of many persons was *ipso facto* transferred from the towns where they had, before the passage of the act, their settlement, to the town where, at the time of the passage of the act, they dwelt and had their home ; and yet no person ever questioned the constitutionality of the measure. The legislature, in their discretion, might have adopted a different or an additional rule. They might have said that the offspring of all persons living together as man and wife should follow and have the settlement of the supposed husband. Or they might have adopted the better rule they actually did in effect adopt, in the resolve under consideration, that the wives and children of men who had been married *de facto,* by the persons mentioned in the resolve, should follow and have the settlement of the husband. So far therefore as the resolve of *March* 19, 1821, has a bearing upon questions of settlement under our pauper laws for expenses incurred subsequently to its passage we cannot doubt its constitutionality.